IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RITHY CHHAK and VALENE STEPHANIE SMITH,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 2:23-cr-00365-TC<br><br>Judge Tena Campbell |

On October 22, 2024, the court held an evidentiary hearing on a motion to suppress filed by Defendant Rithy Chhak and joined by Defendant Valene Stephanie Smith. (ECF No. 59; see also Dkt. Text Order Granting Mot. Joinder, July 16, 2024, ECF No. 76.) The Defendants contest the admissibility of evidence obtained from a search of Mr. Chhak's car that occurred after a drug detection dog named Harley sniffed the car and allegedly provided a positive alert. Mr. Chhak and Ms. Smith maintain that Harley did not reliably indicate the presence of drugs and that there was no probable cause to search the car. As a result, the Defendants argue that the search violated the Fourth Amendment and that any evidence obtained from the search should be suppressed.

After carefully considering the evidence presented at the hearing, including testimony from Harley's handler, testimony from a sergeant at the Utah Department of Public Safety, and a video of Harley's sniff of the car, the court finds that the United States has carried its burden to

show that there was probable cause for the search.  Accordingly, the court denies the motion to suppress.

## BACKGROUND

On October 4, 2023, a grand jury returned an indictment charging Mr. Chhak and Ms. Smith with one count of Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1) and charging Mr. Chhak with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1).  (Indictment, ECF No. 1.)  The next day, the Taylorsville police stopped the Defendants while Ms. Smith was driving them in Mr. Chhak's car and arrested them on the warrants issued with the indictment.  The police then asked Officer Michael Rodriguez, an officer with the West Jordan Police Department, to bring his drug detection K-9 dog, Harley, to perform a sniff of the car.  The parties dispute whether Harley gave a positive alert to the odor of drugs.

After searching Mr. Chhak's car, the police found 119 grams of a substance that later tested positive for methamphetamine.  On May 15, 2024, a grand jury returned a superseding indictment that charged both Mr. Chhak and Ms. Smith with an additional count of Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1).  (ECF No. 52.) Mr. Chhak then filed the motion to suppress at issue here, and Ms. Smith joined in the motion. (ECF Nos. 59 & 76.)

At the evidentiary hearing on October 22, 2024, the court heard testimony from Sergeant Art Lopez of the Utah Department of Public Safety and Officer Rodriguez.  The parties then submitted proposed findings of fact and conclusions of law.  (ECF Nos. 96–98.)

## FINDINGS OF FACT

Sergeant Lopez is employed by the Utah Department of Public Safety as a K-9 manager for the Police Officer Standards and Training (POST) program.  (Hr'g Tr., Oct. 22, 2024, ECF No. 92 at 6–8.)  His "main responsibility" is to "oversee training and certifications for police dogs throughout the state of Utah and also departments across the nation."  (Tr. 7.)  He also reviews reports and gives his opinion about the deployments of police dogs in Utah and other states.  (Id.)  He has been employed by POST for "about two and a half years" but has been in law enforcement for 28 years and worked with K-9 units for about 20 years.  (Tr. 7–9.)  He has presented approximately 20 to 30 times throughout his career on the use of K-9s in law enforcement and has been published in Police K-9 magazine.  (Tr. 18.)  He has also trained over 800 police dogs.  (Tr. 79.)  Sergeant Lopez testified that the POST K-9 training program is nationally and internationally recognized.  (Tr. 10–11.)

Sergeant Lopez provided two explanations that are helpful in understanding whether Harley provided a valid indication that drugs were present in Mr. Chhak's car.  First, he testified that there is a difference between alert behavior and a final response or indication.  Alert behavior occurs when a dog trained to detect drugs "show[s] a lot of interest" in a specific area and attempts to pinpoint the source of an odor: "[Y]ou'll see an intense, focused sniffing of the area.  The dog doesn't leave the area until he tries to figure out if he can get to it closer from the other side of the vehicle or the room …."  (Tr. 17.)  Sergeant Lopez maintained that a trained dog will always alert before giving a final indication.  (Id.)

In contrast, Sergeant Lopez testified that an indication is a "trained response" that tells the handler where the odor is strongest.  (Tr. 16–17.)  Different dogs may exhibit different types of final indications: "[For a] passive dog, an indication is a sit and stare, a lay down and stare, or

a stand and stare, like a point on the location.  They do not move from that location until the handler praises them off [sic] or rewards them." (Tr. 16.)  Sergeant Lopez asserted that a final indication is an "obvious sign that people can see[,]" even if that person is "somebody who hasn't trained dogs …." (Tr. 25.)

Sergeant Lopez also explained a concept called "cueing."  Cueing occurs when a handler causes a dog to give a final indication even though the dog has not found the odor of drugs—in other words, a false positive.  (Tr. 22, 77–78.)  Sergeant Lopez testified that the best example of cueing is when an officer stops and focuses on one area, which may cause the dog to stop as well.  (Tr. 22, 77.)  To avoid cueing, Sergeant Lopez trains handlers to "continuously move on and not to focus on one area, let the dog self-discover the areas where they want." (Tr. 22.) Sergeant Lopez acknowledged that cueing is often inadvertent.  (Tr. 45–46.)

To prepare for his testimony in this case, Sergeant Lopez reviewed Officer Rodriguez's report on his deployment of Harley to sniff Mr. Chhak's car and watched the video footage from the dash camera in Officer Rodriguez's car at least ten times.  (Tr. 31–32, 38–39.)  He also noted that Officer Rodriguez and Harley were up to date with their certifications.  (Tr. 31.)  Sergeant Lopez admitted that he only looked at a few pages of the approximately 1,000 pages of training records for Harley, as he focused instead on the police report describing the specific deployment in question.  (Tr. 49–50.)

The relevant video footage shows that Officer Rodriguez parked behind Mr. Chhak's car at an angle such that only the driver's side and rear end of the car are clearly visible.  (Gov't Ex. 1 at 10:42:28.)  Officer Rodriguez then gives Harley a signal to sniff the car, first examining the driver's side before moving around the back of the car to the passenger's side.  (Id.)  Harley disappears from view when she is sniffing the passenger's side of the car, although the footage

4

depicts Officer Rodriguez walking back and forth and holding a loose leash.  (Id. at 10:43:03.)
The video then shows Officer Rodriguez giving Harley a reward.  (Id. at 10:43:18.)

Sergeant Lopez testified that, while Harley's body language is not visible on the
passenger's side of the car because of the camera angle, he could nevertheless observe that the
leash wasn't moving while Officer Rodriguez walked back and forth, which suggested to him
that Harley was focused on one area and exhibiting alert behavior.  (Tr. 40–41.)  He further
testified that Officer Rodriguez correctly acted as the "dumb end of the leash" and kept the leash
loose so that Harley could work freely: "In this case, the leash is loose the whole time during the
deployment of it, and the dog is able to work independently."  (Tr. 38–39.)  From his
observations, Sergeant Lopez believed that "Officer Rodriguez did recognize an alert and
indication," although he explained that Officer Rodriguez would "have to be the one to testify on
that" because Harley was hidden from view.  (Tr. 41.)

Sergeant Lopez stated that he is not involved with any disciplinary actions for officers
and that he has previously explained to prosecutors and officers when he disagrees with an
officer's interpretation of an alert or indication: "I've reviewed a couple of K-9 cases where
they've called the alert or indication that I felt it wasn't there.  The dog did not have the correct
alert behavior prior to the indication."  (Tr. 29.)  In this matter, Sergeant Lopez disagreed with
Officer Rodriguez in one aspect of Harley's deployment—namely, that Officer Rodriguez failed
to recognize Harley's alert behavior on the driver's side of the car.  (Tr. 65.)  This behavior
occurred towards the beginning of the sniff when Harley gave a "quick head snap …."  (Tr. 37.)
Otherwise, Sergeant Lopez testified that he did not observe any cueing and that the deployment
was consistent with best practices.  (Tr. 42, 81.)

Officer Rodriguez also testified at the evidentiary hearing.  Officer Rodriguez has seven years of experience in law enforcement and is currently a member of the West Jordan Police Department in the K-9 unit.  (Tr. 88–89.)  He has spent three or four years as Harley's handler.  (Tr. 91.)  Indeed, he and Harley completed their POST training together and they have recertified every year.  (Tr. 91.)  Harley lives with Officer Rodriguez and the two engage in training almost every day, totaling approximately 10 hours of training per week.  (Tr. 93–95.)  Officer Rodriguez estimated that he has done thousands of hours of training with Harley.  (Tr. 97.)

Harley is a narcotics detection dog trained to detect methamphetamine, as well as heroin, cocaine, marijuana, and mushrooms.  (Tr. 91.)  Officer Rodriguez testified that Harley gives a passive indication when she detects the odor of narcotics, which means that she will either stand and stare or sit and stare.  (Tr. 91–93.)

On October 5, 2023, Officer Rodriguez testified that he received a call from the Taylorsville Police Department after he had just returned home from his regular patrol and was about to go to sleep.  (Tr. 100–01.)  Because he was off duty, his police vest was at the police station, which meant that he was not wearing a body-worn camera when he arrived at the parking lot.  (Tr. 101–02, 136–37.)  The detectives in the parking lot told him they needed "a vehicle sniff, K-9 sniff" and pointed to Mr. Chhak's car.  (Tr. 102.)  Officer Rodriguez then turned on the camera on his dashboard and parked behind Mr. Chhak's car, which is visible in the video provided to the court.  (Tr. 103; Gov't Ex. 1.)

During the sniff, Officer Rodriguez testified that he did not believe Harley exhibited alert behavior on the driver's side of the car because "[s]he continued sniffing versus being focused on one particular area."  (Tr. 107.)  But he testified that he did notice an alert on the passenger door: "She was, like her sniffing became really fast, very rapid, and she was trying to, like, sniff

where the odor was coming from." (Tr. 109.) Officer Rodriguez stated that he then "grab[bed]"

Harley to "detail that area[,]" which he explained meant that he wanted to "double-check on that

alert and help her figure out ... the source of the odor that she's trying to find." (Tr. 110.) After

that, Officer Rodriguez testified that he gave Harley a toy after she indicated a "final positive

response to the odor of narcotics." (Tr. 111.) Specifically, Officer Rodriguez described that

Harley was "staring at the seam of the vehicle, and started wagging her tail from side to side,

very excited" and that she had stopped moving and "was just focused on that." (Id.)

 The court finds that the testimony of both Sergeant Lopez and Officer Rodriguez was

credible. The court therefore finds that Harley exhibited alert behavior on the passenger's side of

Mr. Chhak's car and gave a final indication for the presence of drugs.

## CONCLUSIONS OF LAW

 The Fourth Amendment protects people from "unreasonable searches and seizures ...."

U.S. Const. amend. IV. But consistent with this protection, police officers "may search an

automobile and the containers within it where they have probable cause to believe contraband or

evidence is contained." California v. Acevedo, 500 U.S. 565, 580 (1991). And "a positive alert

by a certified drug dog is generally enough, by itself, to give officers probable cause to search a

vehicle." United States v. Ludwig, 641 F.3d 1243, 1250–51 (10th Cir. 2011) (citing United

States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009)); see also Florida v. Harris, 568 U.S. 237,

240 (2013) (upholding a trial court's decision that police had probable cause to search a

defendant's truck where a certified drug detection dog provided a positive alert by "signaling,

through a distinctive set of behaviors, that he smelled drugs").

 Indeed, the Tenth Circuit has held that, even in the absence of a "final indication,"

probable cause can exist solely based on a dog's "alert." Parada, 577 F.3d at 1281–82. And a

dog's certification is presumptive evidence of a dog's reliability.  See Ludwig, 641 F.3d at 1251 ("[C]ourts typically rely on the dog's certification as proof of its reliability."); United States v. Kennedy, 131 F.3d 1371, 1378 (10th Cir. 1997) ("[W]ith a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill.").  After all, the Tenth Circuit has noted that "it is safe to assume that canine professionals are better equipped than judges to say whether an individual dog is up to snuff."  Ludwig, 641 F.3d at 1251.

Here, the court has found that Officer Rodriguez and Sergeant Lopez both provided credible testimony that Harley exhibited alert behavior and a final indication.  Although the video evidence does not clearly show Harley's behavior, it does show Officer Rodriguez's actions and the position of the leash.  This objective evidence corroborates the testimony provided by the government's witnesses.  Finally, Harley and Officer Rodriguez are both up to date with their POST certifications and the defense presented no evidence questioning Harley's reliability or record.  Accordingly, the court finds that Harley gave a positive indication for the presence of drugs and that Officer Rodriguez had probable cause to search Mr. Chhak's car.

Mr. Chhak and Ms. Smith make several arguments about why the court should nevertheless grant the motion to suppress, but the court is not persuaded.  First, Mr. Chhak maintains that Officer Rodriguez violated best practices when he responded to the call from the Taylorsville Police Department because the use of off-duty K-9 teams is "discouraged[,]" and the West Jordan Police Department requires that "[a]ll requests from outside agencies must be approved by the Watch Commander …."  (See West Jordan Police Dept. Policy Manual, Ex. 1 to Rithy Chhak's Proposed Findings of Fact & Conclusions of Law, ECF No. 97-1.)  It is unclear whether the Watch Commander approved Harley's deployment, but the court finds no evidence

that Officer Rodriguez's actions were unreasonable or that a minor violation of the department's policies requires the suppression of evidence.

Similarly, Mr. Chhak notes that Officer Rodriguez was not wearing his body-worn camera and that he positioned his car in such a way that the dashboard camera failed to capture Harley's behavior on the passenger's side of the car. But the court finds that neither of these actions suggests bad faith. Officer Rodriguez provided a reasonable explanation for his lack of a body-worn camera (he was off duty and had left his vest at the police station) and the court is not persuaded that the position of the dashboard camera is fatal to a finding of probable cause. As discussed above, the camera <u>does</u> show Officer Rodriguez's actions and the position of the leash, which allow for a degree of objectivity in Sergeant Lopez's review of that video.

Third, Mr. Chhak argues that Harley's behavior was unreliable because Sergeant Lopez and Officer Rodriguez disagreed about whether Harley displayed alert behavior while sniffing the driver's side of the car. But the fact that the witnesses disagreed about a less obvious form of alert behavior (in this case, a quick snap of Harley's head) does not imply that Harley's alert behavior and final indication on the passenger's side of the car was similarly unclear. If anything, the disagreement illustrates that Sergeant Lopez does not simply agree that the actions taken by the officers he is reviewing are always correct. The court has also watched the video multiple times and notes that, while Harley's head snap is unremarkable, it is evident that some sort of distinct behavior occurs on the passenger's side of the car when Officer Rodriguez walks back and forth for several seconds and the leash does not move.

Finally, Mr. Chhak points to a 2017 case from this court, in which the Honorable Clark Waddoups expressed concern about the Tenth Circuit's "broad proclamations and comfort in canine sniffs and their certifiers." <u>United States v. Esteban</u>, 283 F. Supp. 3d 1115, 1134 (D. Utah

2017).  In that case, Judge Waddoups granted a defendant's motion to suppress after an

evidentiary hearing in which he determined that the testimony from the police provided only a

subjective assessment of the dog's behavior.  Id. at 1136–37.  But in Esteban, the drug detection

dog, Drago, gave only an alert and not a final indication.  See id. at 1122 (describing testimony

from the trooper performing the traffic stop that Drago "'alerted' on the tailgate and 'squatted

like he was gonna sit,' but that 'it was weird because he wouldn't sit'" (citations omitted)); id.

at 1125 (describing testimony from a reviewing expert that Drago only exhibited "two of the

three elements associated with the trained final response").  In addition, Judge Waddoups

granted the motion to suppress for two independent reasons—namely, that the traffic stop was

pretextual and there was no reasonable suspicion to prolong the stop.  Id. at 1129–30, 1133.

Third, Judge Waddoups relied on the defense's expert, who also viewed the relevant video

evidence and testified that there was "no value … whatsoever" in the indications displayed by

Drago.  Id. at 1124.  Finally, Judge Waddoups found that Drago had an unreliable record, noting

that "the evidence shows Drago had numerous false alerts around the relevant time …."  Id.

at 1135.

 None of these factors are present here.  Officer Rodriguez testified that Harley gave a

final indication, not just an alert.  There was no pretext for the stop, as both Mr. Chhak and Ms.

Smith had outstanding arrest warrants.  Finally, the defense provided no expert testimony or

other evidence that contradicted Sergeant Lopez's assessment of the video or questioned

Harley's reliability.  The court therefore relies on Haley's certifications, her extensive training

record, Officer Rodriguez's testimony about her behavior during the deployment, and Sergeant

Lopez's interpretation of the video evidence.

For her part, Ms. Smith challenges Officer Rodriguez's statement that he "grab[bed]" Harley to direct her back to an area where she had exhibited alert behavior, arguing that Officer Rodriguez's actions amounted to cueing. The court disagrees. The video evidence demonstrates that, even if Officer Rodriguez directed Harley to return to an area, he then continued to move back and forth to let her work independently. Sergeant Lopez affirmed that Officer Rodriguez was not cueing and the court agrees with that assessment.

### ORDER

For the reasons stated above, the court ORDERS as follows:

1.      The court DENIES Mr. Chhak's motion to suppress. (ECF No. 59.)

2.      The court sets a 4-day jury trial to commence on July 8, 2025.

3.      The time until July 8, 2025, shall be excluded for purposes of the Speedy Trial Act to allow counsel to prepare for trial.

DATED this 20th day of March, 2025.

BY THE COURT:

_____
Tena Campbell
United States District Judge